**UNITED STATES of America**

**v.**

**John DOE.**

**In the Matter of a Grand Jury Subpoena Served Upon Richard FALK.**

**E.B.D. No. 71–165.**

United States District Court,
D. Massachusetts.

Oct. 4, 1971.

---

Paul Vincent, John Marple, Asst. U. S. Attys., Dept. of Justice, for the United States.

Jack J. Levine, Philadelphia, Pa., Thomas G. Shapiro, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Petitioner, a prominent professor of international law and critic of the war in Vietnam, seeks to quash a subpoena compelling his appearance before a federal grand jury ostensibly investigating crimes related to the release and dissemination of the much-publicized "Pentagon Papers." At a hearing on August 20, 1971, the court stayed Professor Falk's appearance and ordered that petitioner and the government file affidavits and memoranda of law prior to a further hearing on September 10.

That the grand jury is investigating crimes related to the Pentagon Papers, which were the subject of the decision of the Supreme Court in New York Times Company v. United States, 1971, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822, and for whose alleged unauthorized possession and conversion Daniel Ellsberg has been indicted in the Central District of California, is apparent from the prosecuting attorneys' oaths of office on file with the Clerk. They describe the current investigation as being based on information "that various persons have violated in the District of Massachusetts the laws relating to the retention of public property or records with intent to convert (18 U.S.C. 641), the gathering and transmitting of national defense information (18 U.S.C. 793), the concealment or removal of public records or documents (18 U.S.C. 2071), and conspiracy to commit such offenses and to defraud the United States (18 U.S.C. 371)." The parties' arguments have proceeded on this assumption.

The nature of the petitioner's claim, which is supported by thirty affidavits, including his own, is indicated by the following excerpts from his affidavit:

> My motion to quash this subpoena is based on the principal contention that my *mere appearance* before *this particular* Grand Jury will impair greatly my capacity to carry on my professional duties in an effective fashion. This contention arises from the rather distinctive character of my professional identity. Much of my professional work has involved writing and advising on the United States role in the Vietnam War. This effort has been dependent upon the trust of many individuals and upon access to a variety of kinds of confidential information. My contact with the subject-matter of this Grand Jury investigation is solely a consequence of this trust and with the exclusive purpose of carrying out my professional role as an author and a journalist. To require my appearance in a secret proceeding of this type that is concerned with this subject would undermine the confidence of others in my capacity to protect my sources of information against disclosure.

> \* \* \* \* \* \*

> My professional work involves a number of different roles. In several of these roles relating to writing and advising on matters of United States foreign policy, especially in the setting of the Vietnam War, the relevance of confidentiality should become apparent from a recital of my actual experience over the last several years. In brief, confidentiality of relationship has been essential for me in the following roles: (1) as a scholar devoted to revealing the truth as it relates to issues of American foreign policy and, in particular, to the Vietnam War; (2) as a journalist who writes for the public on these issues in national newspapers and magazines; (3) as a consultant for TV and radio broadcast activity in relation to this subject-matter; (4) as an expert witness for defendants who rely on arguments relating to the legal status of the war; (5) as a consultant and adviser to Members of Congress and other government officials concerned with these issues.

At the hearing, in arguing the breadth of the interest relied upon by petitioner, counsel quoted as follows from the affidavit of Professor Stanley Hoffman of Harvard University, Professor of Gov-

ernment and Chairman of the University's Standing Committee on West European Studies:

> This scholarly function goes beyond the role which the media perform in informing the public, also on the basis of research whose confidentiality must be protected. To be sure, governments do not always like the analyses or advice scholars produce. But the destruction of the function scholars provide is too high a price to pay in retaliation for unwelcome views or unorthodox judgments. Scholars are of course morally and legally responsible for what they prescribe. But such responsibility is one thing, an obligation to divulge their sources is quite another—and would come dangerously close to harassment.

The parties rely heavily on two recent decisions, one by the Court of Appeals for the Ninth Circuit concerning a newspaper reporter and one by the Supreme Judicial Court for Massachusetts concerning a newsman-photographer, in which the Supreme Court has granted certiorari. Petitioner's precedent is Caldwell v. United States, 9 Cir., 1970, 434 F.2d 1081, cert. granted 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109. There a federal grand jury conducting a "general investigation" into a possible criminal activity by members of the Black Panther Party subpoenaed petitioner, a black reporter for the New York Times specializing in news concerning Panther activities. By motion in the District Court, petitioner sought to quash the subpoena, arguing (as the court later found) that "compelled disclosure of information received by a journalist within the scope of * * * confidential relationships jeopardizes those relationships and thereby impairs the journalist's ability to gather, analyze and publish the news. * * *" Application of Caldwell, N.D.Calif., 1970, 311

F.Supp. 358, 361. The district court nevertheless ordered that he testify, entering instead a broad protective order designed to shut off investigation into confidential information while permitting "questions concerning * * * statements or information * * * given to him for publication or public disclosure. * * *" Id. at 362.

Caldwell refused to appear, and on appeal from the ensuing contempt order the Court of Appeals reversed, holding that even his mere appearance before the grand jury would jeopardize "the public's First Amendment right to be informed. * * *" United States v. Caldwell, supra, 434 F.2d at 1089.[1] The court emphasized, however, the narrowness of its holding; while recognizing that the threat of lost sources was dominant in the case before it, it stated that "not every news source * * * is as sensitive as the Black Panther Party. * * *" Id. at 1090.

The government cites In Re Pappas, 1971 Mass.Adv.Sh. 69, 266 N.E.2d 297, cert. granted 402 U.S. 942, 91 S.Ct. 1619, 29 L.Ed.2d 110, in which a newsman-photographer employed by a television station refused to answer certain questions of the grand jury about what he saw and heard in a store serving as a Black Panther Headquarters. Pappas had been allowed to enter the headquarters on condition that he not report anything he saw or heard inside the store except a police raid. In rejecting his contentions that his testimony before the grand jury would violate a privilege to protect the source of information acquired in confidence and his rights under the First and Fifth Amendments to the Constitution of the United States, the court stated at 76, 266 N.E.2d at 302:

> Were we to adopt the broad conclusions of that [Caldwell] decision, that

---

1. "Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." Barenblatt v. United States, 1959, 360 U.S. 109, 126, 79 S.Ct. 1081, 1093, 3 L.Ed.2d 1115.

a newsman's privilege exists because of the First Amendment, we would be engaging in judicial amendment of the Constitution or judicial legislation. Requiring a newsman to testify about facts of his knowledge does not prevent their publication or the circulation of information. Any effect on the free dissemination of news is indirect, theoretical, and uncertain, and relates at most to the future gathering of news. The opinion in the *Caldwell* case largely disregards important interests of the Federal government and the several States in enforcement of the criminal law for the benefit of the general public. We are of the view also that the opinion unnecessarily expresses, in terms of newly discovered constitutional absolutes, interests of the news media, which (so far as reasonably requiring protection) may be guarded by sound judicial discretion and administration.

■ In the court's opinion petitioner does not fit within the *Caldwell* doctrine, though not mainly because he is not a newspaper reporter. The public interest under the First Amendment in the "maximization of the 'spectrum of available knowledge'" which the *Caldwell* court deemed sufficient to override an unlimited grand jury subpoena clearly is of the same general nature as the public interest alleged by petitioner here. In no way do his facts become any less a part of the "spectrum of available knowledge," Griswold v. Connecticut, 1965, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510, for appearing in books and articles rather than in a newspaper. Such media are "vehicle[s] of information and opinion" of a type long recognized by the Supreme Court as being within its definition of "the press." Lovell v. Griffin, 1938, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949.

■ Even though a substantial First Amendment right is here involved, the *Caldwell* protection is not applicable because, upon consideration of all the affidavits filed in support of the motion, the court perceives no real likelihood that petitioner's sources of lawfully transmitted information will be inhibited by his mere appearance before the grand jury.[2] The facts here and in the *Caldwell* case are crucially distinguishable. Reporter Caldwell's sources were members of the Black Panther Party, persons often lacking in education and sophistication whose distrust of government, especially of police and prosecutors, is well known. No persuasive analogy can be drawn between a Black Panther's fear of harassment and prosecution and the anxieties of petitioner's sources who likely are highly trained and sophisticated individuals. Such persons, highly placed in the councils of government, education and industry, undoubtedly will continue to "leak" confidential but otherwise lawful information to petitioner and indeed to other scholars, journalists and consultants too. The facts here fall far short of showing a confidential relationship between petitioner and his "contacts" as unique and exclusive as that which obtained between Caldwell and his Black Panther acquaintances.

In addition, the grand jury in the California case was engaged in a "general investigation" not focused on specific crimes. Caldwell v. United States, *supra*, at 1082. While even such a general investigation may be conducted, Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, it is clear that one might operate to place reasonable fear of disclosure and jeopardy into the minds of diverse law-abiding citizens. Here, however, the government has indicated the specific statutory offenses which it is investigating, State v. Knops, 1971, 49 Wis.2d 647, 183 N.W.2d 93, and the reasonableness, of such investigation is supported by the fact that at least some of the Pentagon Papers, or copies thereof,

---

**2.** The issue of the legality of Professor Falk's information and sources is not before the court and for purposes of this decision the information is presumed both lawful and of public value. Obviously, sources of illegally revealed information may and must be "inhibited" by investigation and prosecution.

were possessed by persons in Massachusetts, since portions were published by a Boston newspaper.[3] Where the investigation is thus focused, the court will not presume that men of substantial intelligence and good intent will be inhibited from pursuing otherwise lawful activity; it is more rational, and more likely, that such persons will presume that the grand jury process will not be misused against them.

The motion to quash is denied. So ordered.

---

3. In New York Times Co. v. United States, *supra*, 403 U.S. at 754, 91 S.Ct. at 2161, 29 L.Ed.2d 822, Mr. Justice Harlan, dissenting, referred to "the seemingly uncontested facts that the documents, or the originals of which they are duplicates, were purloined from the Government's possession and that the [New York Times and Washington Post] newspapers received them with knowledge that they had been feloniously acquired."